UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

WILSON PAGAN, et al.,

                              Plaintiffs,                    **12-CV-07669 (PAE)(SN)**

              -against-                                      **REPORT AND
                                                            RECOMMENDATION**

WESTCHESTER COUNTY, et al.,

                              Defendants.

----------------------------------------------------------------X

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE PAUL A. ENGELMAYER:**

        Plaintiffs Wilson Pagan, Steven Lewis, Yusuf Dixon, Michael Stevens, Quiane Williams,

Santiago Gomez,[1] Guario Vargas, Gerald Charles, Christopher Glivens, William P. Jenkins,

Pedro Llerandez, Adem Arici, Jerome Barnett, Joseph Dushock, and Armando Sanchez

(collectively, the "plaintiffs"), bring this action pursuant to 42 U.S.C. § 1983 for violations of

their First, Eighth, and Fourteenth Amendment rights. Plaintiffs also bring claims under the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, and

under New York state law.

        Plaintiffs sue multiple defendants: (1) Westchester County; (2) Kevin Cheverko,

individually and in his official capacity as Commissioner of Westchester County Department of

Corrections ("WCDOC") (collectively, the "County defendants"); (3) Aramark Correctional

---

[1] Santiago Gomez is acting as lead plaintiff in this case. Gomez filed most of the grievances and
complaints at issue in this case as well as the oppositions to the motions to dismiss. The court takes
judicial notice of the fact that Gomez has sued Westchester County on multiple occasions. The Supreme
Court Westchester County recently dismissed an Article 78 proceeding based on similar facts. Santiago
Gomez v. Westchester County and Aramark, index no. 00657/12. (Aramark Mot. to Dismiss, David Lane
Declaration, Exh. A.)

Services LLC ("Aramark"), individually and in its official capacity; (4) Donna Blackman, individually as Aramark's Commissary Supervisor; and (5) Joseph Loughran, individually as Aramark's Food Services Director (collectively, the "Aramark defendants").

The County and Aramark defendants have each moved to dismiss the Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. For the reasons set forth below, I recommend that defendants' motions be GRANTED in part, and DENIED in part.

## BACKGROUND

### I.   Factual Background

The following facts are assumed to be true for the purposes of this motion.

### A.  Food Preparation

In or around 1996, Westchester County contracted with Aramark Correctional Services to provide food to the inmate population at Westchester County Jail (the "Jail"). Aramark is responsible for providing three daily meals to inmates, which are prepared and served with the assistance of inmate workers. Joseph Loughran is the Director of Food Services for Aramark at the Jail. He is responsible for supervising inmate workers in the preparation of food for the inmate population.

Plaintiffs arrived at the Jail between May 13, 2010, and July 18, 2012. Each plaintiff alleges that he received undercooked or rotted meals on a tray containing mold or bacteria from water that lodged in the tray and rotted. (Sec. Am. Compl. ¶¶ 57, 69, 72, 84, 99, 124, 136, 145, 149, 154.) Plaintiffs also received "small," "uneven," or "minimal" portions of food. (Sec. Am. Compl. ¶¶ 57, 63, 81, 93, 129, 141, 146, 149.) Some plaintiffs were served rotted salads with brown-edged lettuce (Sec. Am. Compl. ¶¶ 57, 149) or salads with insects in them. (Sec. Am.

Compl. ¶¶ 84, 149, 154.) As of result of either eating the improperly cooked food from the moldy trays or refusing to eat such food, plaintiffs experienced severe stomach pains, nausea, vomiting, fever, headaches, diarrhea, weight loss, fatigue, dizziness, dehydration, and stretch marks. (Sec. Am. Compl. ¶¶ 63, 82, 96, 117, 141, 147, 153, 155; p. 31.)

Plaintiff Barnett worked in the Jail kitchen and personally observed much of the conduct described. He witnessed a lack of training, disregard for food temperatures, food being served on rotted trays, rotten or undercooked meat being served, insects in vegetables, and workers not wearing proper protective gear during food preparation and handling.

Inmates at the Jail, including some plaintiffs, wrote to Aramark officials and notified them of these violations. Aramark ignored these complaints and failed to correct these violations to prevent future harm. Furthermore, Aramark intentionally served minimum portions on unsanitary trays or served undercooked or insect-infested food to force inmates to purchase over-priced items from the commissary, which is also run by Aramark. Aramark worked in concert with Westchester County to gain financially at the expense of the inmates.

Commissioner Cheverko was also aware of the grievances and complaints regarding the food. Plaintiffs allege, on information and belief, that Cheverko holds daily meetings with senior members of his staff, including Warden Diaz and Sergeant Marable, and defendants Donna Blackman and Joseph Loughran of Aramark. During these meetings, the staff members inform Cheverko of the previous day's events. Staff also discussed the grievances of Gomez and Arici. In addition to reviewing "complaint books" and hearing about inmate grievances, Commissioner Cheverko was also put on notice about these violations from a letter from Westchester County Executive Robert P. Astorino. Notwithstanding all this, Cheverko did nothing to correct the food safety violations.

Aramark Food Services Director Loughran was also aware that food was served at improper temperatures and did not properly train new workers in food handling. He ignored the fact that inmate workers were not serving the required amounts of food, and he disposed of rotten food only when there was a complaint. Loughran also knew that the meal trays contained mold.

### B.  Commissary and iCare Packages

Aramark is also responsible for running a commissary at the Jail. Donna Blackman is the Commissary Supervisor for Aramark. Knowing that inmates were not receiving nutrients from other sources, defendants "jacked up prices" for commissary items and sold some items that were not intended for individual sale. Daily necessities were sold for a profit beyond a modest return. All of the defendants worked together to profit from this "monopoly."

To avoid eating the undercooked, rotted, or unsanitary food, plaintiffs would purchase these overpriced commissary items or would request that their families do so. Defendants created a website that allows family and friends to purchase commissary items for inmates (the "iCare Program"). Defendants charge a five dollar shipping and handling fee. The products, however, are not shipped; they are packaged at the commissary within the Jail.

### C.  Religious Practices

Pagan is an active Catholic believer and has been since birth. Recognizing that Jewish inmates received adequate amounts of food served on sanitary meal trays, Pagan "switched his religion on file" at the Jail in order to receive kosher meals. As a result of this change, Pagan was no longer allowed to attend Catholic mass.

Dixon is an active Muslim believer. When Dixon complained about the undercooked meals and the condition of the trays, defendants issued him an alternative bologna and cheese

4

sandwich. Muslims are not permitted to eat bologna. Defendants also did not provide Dixon with his religious meals as often as the Jewish inmates.

Lewis is a Catholic believer and has been since birth. In order to receive the required nutrients, Lewis changed his religion from Catholic to Jewish so that he could receive the kosher meals. As a result, Lewis could no longer attend Catholic mass.

Arici is a practicing Muslim and has been since birth. Upon admission to the Jail, Arici informed correctional staff of his Muslim faith. At the reception housing unit, Arici received a regular meal tray rather than a religious meal. Arici notified a correctional officer assigned to his housing unit who requested a religiously acceptable replacement tray. Arici had to remind the correctional staff of his need for a religious meal tray for approximately one week. Another inmate informed Arici that he should be careful eating his meals because he had observed an inmate worker spitting in Arici's meal. The inmate worker was annoyed and offended that he had to keep replacing Arici's meal for a Muslim meal. Arici notified correctional staff of this, but the inmate worker was never disciplined. Arici subsequently underwent medical testing that revealed he had hepatitis B. Arici is certain he contracted the disease from the inmate worker's spit. Arici alleges that defendants effectively forced him to eat food not permitted by his Muslim faith because the food that was compliant with his faith was served uncooked, rotted, or in an unsanitary manner.

Williams is an active Muslim and was before his arrival at the Jail. Defendants offered Williams a bologna and cheese sandwich as an alternative to his religious meal when he complained of the foods condition. Williams, as a Muslim, is not permitted to eat bologna.

Stevens is a Muslim believer. Defendants offered him a bolgna and cheese sandwich as an alternative to the undercooked, rotted, or unsanitary food. As a Muslim, Stevens is not permitted to eat bologna.

Charles is an active Muslim inmate. He did not receive his halal meals as often as the Jewish inmates received their kosher meals.

### D.  Grievances and Complaints

At the Jail, grievances can be submitted only to supervisors. Supervisors at the Jail get annoyed when an inmate attempts to file a grievance and create an atmosphere of hostility for prisoners who file multiple grievances to deter future grievances. Inmates at the Jail who file multiple grievances are transferred to the most secure general population housing units in the "Old Jail," which has a mandatory 18-hour lock down, unlike the majority of other areas at the Jail.

Gomez and Arici filed multiple grievances regarding each of the claims raised in the Second Amended Complaint. (Sec. Am. Compl. ¶ 52.) Gomez filed numerous formal complaints to correctional staff regarding meals and other conditions in the housing units. (Sec. Am. Compl. ¶¶ 86, 88.) Gomez filed complaints with Warden Diaz (in person and by letter), Westchester County Executive Robert Astorino, and the Food Safety Administration. (Sec. Am. Compl. ¶¶ 89, 90.) Gomez obtained 72 inmate signatures to support his claims. (Sec. Am. Compl. ¶ 92.)

Arici filed numerous grievances regarding the conditions of his meals. He also filed formal complaints, which were logged in the Jail complaint book. (Sec. Am. Compl. ¶¶ 126, 128.) In spite of his grievances, his meals continued to be served with under-cooked food, peeling plastic, and a foul odor. (Sec. Am. Compl. ¶ 129.)

Pagan attempted to file a grievance on or around May 13, 2010, regarding the condition of his meals. He made a formal complaint to a correctional officer on post, but was told that corrections has nothing to do with his meal preparation. (Sec. Am. Compl. ¶¶ 58, 59.) Pagan also brought his concern to the attention of Sergeant Hubbard who informed him that the trays have been leaking for years as a result of the cleaning process. (Sec. Am. Compl. ¶ 60.) In August 2010, September 2010, and January 2011, Pagan attempted to file grievances with Sergeants Hubbard, Coley, and Middleton, all of whom refused to accept the grievance. (Sec. Am. Compl. ¶ 61.)

Dixon made several complaints regarding the condition of his food to Donna Blackman, Warden Leandro Diaz, Deputy Commissioner Wanda Smithson, and Liason Robinson. (Comp. ¶ 74.) Dixon also made complaints to Sergeants Brent and Bell, with grievances in hand. They either did not accept the grievance or there was no investigation of the grievance. (Sec. Am. Compl. ¶ 75.)

Lewis made multiple complaints to correctional staff regarding meal trays and food conditions. (Sec. Am. Compl. ¶ 101.) He was instructed to write to Liason Robinson. (Sec. Am. Compl. ¶ 101.) He received no response. (Sec. Am. Compl. ¶ 101.) Lewis attempted to file multiple grievances with Sergeant Hubbard, who refused to accept the grievances because they were allegedly not grievable issues.[2] (Sec. Am. Compl. ¶ 104.)

Williams and Stevens filed multiple complaints to Warden Leandro Diaz, Deputy Commissioner Wanda Smithson, Liason Robinson, Donna Blackman, and Joseph Loughran.

---

[2] The Westchester County Grievance Procedure deems as non-grievable issues: (1) dispositions or sanctions from disciplinary hearings; (2) administrative segregation housing decisions; (3) issues outside the control of the Chief Administrative Officer; and (4) complaints pertaining to an inmate other than the inmate actually filing the grievance. (Sec. Am. Compl. at Ex. 35.) Thus, it does not appear that complaints about food services are, in fact, non-grievable issues.

(Sec. Am. Compl. ¶¶ 138, 146.) Williams and Stevens attempted to file grievances to Sergeant Bell, but were told that they were wasting their time. (Sec. Am. Compl. ¶¶ 139, 146.)

Plaintiffs Dushock, Sanchez, Llerandez, Jenkins, Glivens, Charles, Barnett, and Vargas all made formal written complaints regarding food services to correctional and Aramark staff. (Sec. Am. Compl. ¶¶ 150, 154.) They also complained to defendants Cheverko, Loughran, and Donna Blackman, as well as to Warden Diaz, Deputy Commissioner Smithson, County Executive Astorino, and Aramark headquarters. (Sec. Am. Compl. ¶ 151.)

Vargas wrote a grievance and attempted to submit it to Sergeant Bell. Sergeant Bell told Vargas that others had already grieved that issue, and he refused to accept the grievance.[3] (Compl. p. 13.)

Charles attempted to submit a grievance to Sergeant Hubbard, who told plaintiff that his issues were not grievable. Charles later tried to submit a grievance to Sergeant Thomalen, who said to him, "Who gives a fuck. You don't have to eat the food. Don't come to jail." (Compl. p. 14.)

Glivens either submitted a grievance or tried to file a grievance for issues regarding commissary violations, but was told by supervisors that it was not their problem and that he should write to Aramark. (Compl. p. 15.)

---

[3] The facts regarding refusals to accept the grievances of Vargas, Charles, Glivens, Jenkins, and Sanchez are taken from the Original Complaint. The Court considers these facts from the prior complaints given the liberal standard of interpretation required for *pro se* pleadings. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) ("It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they *suggest*.") (citation and quotation marks omitted) (emphasis in original). See e.g., Abdul-Hakim Bey v. Hylton, 12 Civ. 5875 (PAE), 2013 WL 6642034, at *1 n.1 (S.D.N.Y. Dec. 16, 2013) (treating a *pro se* plaintiff's Complaint, First Amended Complaint, and Second Amended Complaint as a "single operative complaint").

Sanchez attempted to submit a grievance to Sergeant Hubbard. Sergeant Hubbard told the plaintiff that he should stop coming to jail if he did not like it, and that the issues Sanchez raised were not grievable issues. (Compl. p. 21.)

Jenkins alleges generally that he attempted to submit grievances on numerous occasions, but supervisors refused to accept them with "rehearsed responses." (Compl. p. 16.)

## II.   Procedural History

Plaintiffs filed their initial Complaint on October 12, 2012, their First Amended Complaint on February 4, 2013, and the Second Amended Complaint on July 23, 2013. Plaintiffs seek $750,000,000 in compensatory damages as well as declaratory and injunctive relief.[4] Plaintiffs raised class action claims, but the Honorable Paul A. Engelmayer denied without prejudice the request to appoint *pro bono* counsel given the early stage of litigation. On August 13, 2013, Aramark defendants moved to dismiss the Second Amended Complaint. On that same day, Westchester defendants also moved to dismiss the Second Amended Complaint. On August 27, 2013, Judge Engelmayer referred the case to my docket for general pretrial supervision and dispositive motions. On September 11, 2013, plaintiffs filed an opposition to each of the Motions to Dismiss. On October 8, 2013, Aramark defendants filed a reply, and on October 9, 2013, Westchester defendants filed a reply. At that time, the motions became fully briefed.

---

[4] In reviewing the Second Amended Complaint and the ECF record, it appears that none of the surviving plaintiffs remain incarcerated at the Jail. Therefore, any claims for declaratory or injunctive relief are moot. See Thompson v. Carter, 284 F.3d 411, 415-16 (2d Cir. 2002) (affirming dismissal of inmate's claims for injunctive and declaratory relief against some defendants as moot because he was no longer incarcerated at the facility).

## DISCUSSION

### I.   Standard of Review

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court must take "factual allegations [in the complaint] to be true and draw[] all reasonable inferences in the plaintiff's favor." Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009) (citation omitted). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985) (citation omitted). The Court should not dismiss the complaint if the plaintiff has provided "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that [the Court] must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

The Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken. See Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002); Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

When faced with a *pro se* litigant, the Court must "construe [the] complaint liberally and interpret it to raise the strongest arguments that [it] suggest[s]." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010) (citation and internal quotation marks omitted); see Haines v. Kerner,

404 U.S. 519, 520–21 (1972). "Even in a *pro se* case, however, ... threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Chavis, 618 F.3d at 170 (internal quotation marks omitted). Thus, although the Court is "obligated to draw the most favorable inferences" that the complaint supports, it "cannot invent factual allegations that [the plaintiff] has not pled." Id.

## II. Failure to Exhaust

Defendants argue that all but two plaintiffs, Santiago Gomez and Adem Arici, did not comply with WCDOC grievance procedures; therefore, all claims by plaintiffs other than Gomez and Arici are barred under the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997.

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement is mandatory "regardless of the fit between a prisoner's prayer for relief and the administrative remedies possible." Booth v. Churner, 532 U.S. 731, 739 (2001). It covers "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002).

"[F]ailure to exhaust is an affirmative defense under the PLRA, and . . . inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216 (2007); accord 13D Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Richard D. Freer, Federal Practice and Procedure: Jurisdiction § 3573.4 (3d ed. 2008). Dismissal under Rule 12(b)(6) for non-exhaustion is appropriate only if a plaintiff's failure to exhaust is

evidenced on the face of the complaint. Jones, 549 U.S. at 215. See also Pani v. Empire Blue

Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1998) ("An affirmative defense may be raised by a

[Rule 12(b)(6) motion to dismiss], without resort to summary judgment procedure, if the defense

appears on the face of the complaint."); McCoy v. Goord, 255 F. Supp. 2d 233, 251 (S.D.N.Y.

2003) ("If nonexhaustion is clear from the face of the complaint (and incorporated documents), a

motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted.").

### A.  Gomez and Arici

Defendants appear to concede for purposes of the motions to dismiss that Arici and

Gomez have exhausted their administrative remedies. Both defendants point to the affidavit of

Pam Marable, Litigation Sergeant at WCDOC. In this affidavit, which was attached to the

Second Amended Complaint as Exhibit 38, Marable stated that she "diligently searched" for

grievances by plaintiffs "at or around the time of the allegations." (Sec. Am. Compl., Exh. 38 ¶

7.) Marable further stated that the "only plaintiffs who properly exhausted their administrative

remedies regarding the issues raised" were Gomez and Arici. (Id.) Therefore, the claims of

Gomez and Arici should not be dismissed for failure to exhaust administrative remedies.

### B.  Thirteen Remaining Plaintiffs: Pagan, Lewis, Dixon, Stevens, Williams, Sanchez, Vargas, Charles, Glivens, Jenkins, Llerandez, Barnett, and Dushock

#### 1.  WCDOC Grievance Procedure

On the face of the Second Amended Complaint it is apparent that the thirteen remaining

plaintiffs did not file grievances in accordance with the guidelines set forth by WCDOC.

WCDOC has an established and comprehensive Inmate Grievance Program, which conforms to

the New York State Commission on Correction standards. See also McAllister v. Garrett, 10 Civ.

3828 (LAP), 2012 WL 4471531, at *4 (S.D.N.Y. Sept. 25, 2012) (explaining the internal

grievance procedure for WCDOC). A "grievance" is defined as "a written inmate complaint concerning either written or unwritten facility policies, procedures, rules, practices, programs or the action or inaction of any person within the facility." (Sec. Am. Compl., Ex. 35 at 1.) An inmate who wishes to pursue a grievance may initially make an informal complaint to the Housing Unit Officer, who will "log inmate complaints in the Complaint Logbook along with any action taken to resolve the complaint." (Sec. Am. Compl., Ex. 35 at 2.) If the complaint cannot be resolved by the Housing Unit Officer, "the Sector Supervisor is to be notified." (Id.) If the sector supervisor is unable to resolve the complaint, inmates may file a grievance using a grievance form. An inmate who wishes to pursue a grievance must file a formal grievance within five days of the incident. An inmate, however, can request a grievance form at any time during the process.

Here, it is plain that these thirteen inmates did not follow these procedures. The Second Amended Complaint states that plaintiffs complained or submitted letters to correctional or Aramark staff. (Sec. Am. Compl. ¶¶ 58, 74, 101, 102, 138, 146, 150.) There is no indication that they used grievance forms, filed a complaint within the required time period, or appealed any resulting decisions. Furthermore, the Marable Affidavit stated that a diligent search for filed grievances revealed that "[n]one of the other plaintiffs properly completed the grievance process concerning the issues raised . . . ." (Sec. Am. Compl. Ex. 38 ¶ 7.)

While these letters and complaints may have alerted WCDOC to the concerns of the inmates, such letters are not sufficient to exhaust administrative procedures because they do not follow the WCDOC grievance guidelines. See Macias v. Zenk, 495 F.3d 37, 44 (2d Cir. 2007) (merely alerting prison officials as to the nature of the wrong for which redress is sought does not constitute proper exhaustion); Smith v. City of New York, 12 Civ. 3303 (CM), 2013 WL

5434144, at *13 (S.D.N.Y. Sept. 26, 2013) ("It is well settled that complaints and communications made outside of formal grievance procedures do not satisfy the PLRA's exhaustion requirement."); Simon v. Campos, 09 Civ. 6231 (PKC), 2010 WL 1946871, at *6 (S.D.N.Y. May 10, 2010) (letter and oral complaints failed to satisfy exhaustion requirement); Harrison v. Goord, 07 Civ. 1806 (HB), 2009 WL 1605770, at *8 (S.D.N.Y. June 9, 2009) (same); Colon v. Farrell, 01 Civ. 6480 (FE), 2004 WL 2126659, at *5 (W.D.N.Y. Sept. 23, 2004) (writing a letter, and thus circumventing the sequential grievance process, was insufficient to exhaust administrative remedies).

Moreover, even if the Court were to construe these letters as satisfying the preliminary formal written grievance requirement, there is no indication that such "grievances" were appealed. The full grievance process must be followed for exhaustion. See e.g., Bennett v. Wesley, 11 Civ. 8715 (JMF), 2013 WL 1798001, at *5 (S.D.N.Y. Apr. 29, 2013) (failure to appeal the decision on a filed grievance rendered administrative remedies unexhausted); Gantt v. Horn, 09 Civ. 7310 (PAE), 2013 WL 865844, at *6 (S.D.N.Y. Mar. 8, 2013) ("partial exhaustion of administrative remedies is not sufficient, even if prison officials have actual notice of a claim"). Therefore, the Court concludes that the remaining thirteen plaintiffs did not follow proper WCDOC procedure.

Lastly, the Court addresses the allegation in the Second Amended Complaint that Gomez and Arici filed grievances vicariously on behalf of all the other inmates. (Sec. Am. Compl. ¶ 52.) Filing a grievance on behalf of another inmate is not permitted under New York State Minimum Standards for Local Correctional Facilities. (See Minimum Standards for Local Correctional Facilities, tit. 9, subtit. AA, ch. I, § 7032.4(h); see also Compl., Exh. 35 ("Grievances regarding . . . complaints pertaining to an inmate other than the inmate actually filing the grievance are not

14

grievable . . . .")). Furthermore, the PLRA does not permit vicarious exhaustion. See Davis v.

Shaw, 08 Civ. 364 (NRB), 2009 WL 1490609, at *3 (S.D.N.Y. May 20, 2009) (the PLRA does

not permit plaintiffs to rely on the efforts of others to exhaust their administrative remedies);

Johnson v. Killian, 07 Civ. 6641 (LTS)(DFE), 2009 WL 1066248, at *5 n.1 (S.D.N.Y. Apr. 21,

2009) (no vicarious exhaustion absent class certification). Therefore, given that this case is not a

class action, grievances filed by Gomez and Arici cannot be deemed sufficient exhaustion for the

other plaintiffs.

### 2.  Limited Exceptions to the PLRA's Exhaustion Requirement

While the PLRA's exhaustion requirement is mandatory, certain exceptions apply. Giano

v. Goord, 380 F.3d 670, 677 (2d Cir. 2004). Before dismissing a case for failure to exhaust, the

court must ask:

> [1] whether administrative remedies were in fact "available" to the prisoner . . .
> [2] whether the defendants may have forfeited the affirmative defense of non-
> exhaustion by failing to raise or preserve it, . . . or whether the defendants' own
> actions inhibiting the inmate's exhaustion of remedies may estop one or more of
> the defendants from raising the plaintiff's failure to exhaust as a defense . . . [or]
> [3] whether "special circumstances" have been plausibly alleged that justify the
> prisoner's failure to comply with administrative procedural requirements.

Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004) (internal citations and quotation marks

omitted). The Court of Appeals for the Second Circuit has not yet definitively stated whether an

invocation of any of these exceptions would survive the Supreme Court's decision in Woodford

v. Ngo, 548 U.S. 81 (2006), which requires that prisoners exhaust their administrative remedies

by "using all steps that the agency holds out, and doing so *properly*" Woodford, 548 U.S. at 91.

See Chavis v. Goord, 333 F. App'x 641, 643 (2d Cir. 2009) (noting that the Second Circuit has

not yet ruled on whether this rule survives the Supreme Court's decision in Woodford).

"Nonetheless, courts within this circuit have continued to apply the three-exception analysis to

prison-condition claims where the prisoner is alleged to have failed to exhaust his remedies." Rose v. Masiey, 06 Civ. 464 (LAK)(MHD), 2013 WL 4049512, at *6 (S.D.N.Y. July 16, 2013) report and rec. adopted sub nom. Rose v. Muhammed, 2013 WL 4046298 (S.D.N.Y. Aug. 7, 2013) (internal citation omitted).

Pagan, Lewis, Dixon, Stevens, Williams, Vargas, Charles, and Sanchez allege that they attempted to file a grievance and were thwarted by the Jail personnel. On three separate occasions, Pagan attempted to submit grievances to Sergeants Hubbard, Coley and Middleton, who all refused to accept the grievances with statements such as, "I'll be back to get it" or "That's a[n] Aramark grievance." (Sec. Am. Compl. ¶ 61.) Dixon made several complaints to Sergeants Brent and Bell with grievances in hand. The grievances were neither accepted nor investigated. (Sec. Am. Compl. ¶ 75.) Lewis made multiple complaints to correctional staff and wrote to Liaison Robinson upon being instructed to do so. (Sec. Am. Compl. ¶ 101.) Lewis also attempted to file multiple grievances with Sergeant Hubbard who refused to accept the grievance stating, "That's not us, it's Aramark" or "That's not a grievable issue." (Sec. Am. Compl. ¶ 104.) Williams filed multiple complaints with Jail personnel and received no response. He attempted to file a grievance with Sergeant Bell, who told Williams, "You're wasting your time. This is jail. What do you expect?" (Sec. Am. Compl. ¶¶ 138-39.) Stevens reiterated all of the claims with regard to Williams, including the attempt to file a grievance. (Sec. Am. Compl. ¶ 146.) Vargas tried to submit a grievance to Sergeant Bell. Sergeant Bell stated that other people had already filed grievances for claims regarding the food and trays. He refused to accept Vargas's grievance. (Compl. p. 13.) Charles attempted to submit a grievance to Sergeant Hubbard who informed Charles that his complaints about food were not grievable issues. Charles also tried to submit a grievance to Sergeant Thomalen. Thomalen stated, "Who gives a fuck. You don't have

to eat the food. Don't come to jail." (Compl. at 14.) Sanchez attempted to submit a grievance to Sergeant Hubbard who told him to stop coming to jail if he didn't like the food. Sergeant Hubbard also informed Sanchez that complaints about food were not grievable issues. (Compl. at 21.)

In light of these statements, Pagan, Lewis, Dixon, Stevens, Williams, Vargas, Charles, and Sanchez have sufficiently pled a justification or excuse for failure to exhaust: the defendants' own actions inhibited the inmates' exhaustion of remedies. See Hemphill, 380 F.3d at 686. As such, the Court recommends that the defendants' motions to dismiss for failure to exhaust administrative remedies be denied as to Pagan, Lewis, Dixon, Stevens, Williams, Vargas, Charles, and Sanchez. See Hardimon v. Westchester County, 13 Civ. 1249 (PKC)(MHD), 2013 WL 5952862, at *4 (S.D.N.Y. Nov. 6, 2013) (finding complaint sufficiently alleged facts of a justification or excuse for failure to exhaust where a sergeant refused to accept a grievance); Malik v. City of New York, 11 Civ. 6062 (PAC)(FM), 2012 WL 3345317, at *8 (S.D.N.Y. Aug. 15, 2012) (denying motion to dismiss for failure to exhaust where plaintiff stated grievance forms were neither available nor processed); Sandlin v. Poole, 575 F. Supp. 2d 484, 488 (W.D.N.Y. 2008) (including allegations of a refusal to accept or forward appeals of grievance decisions as evidence of an excuse for failure to exhaust).

Plaintiffs Glivens, Llerandez, Barnett, Jenkins, and Dushock, however, failed to allege any facts that would excuse their noncompliance with WCDOC grievance procedures. While the Second Amended Complaint generally alleges that there is an atmosphere of hostility at the Jail for prisoners who file multiple grievances and that those who file multiple grievances are transferred to the "Old Jail," these allegations lack the kind of specificity and particularity required to establish an excuse for failure to exhaust administrative remedies. See e.g.,

17

Litchmore v. Williams, 11 Civ. 7546 (DAB)(JCF), 2013 WL 3975956, at *6-7 (S.D.N.Y. Aug. 5,

2013) (finding a conclusory statement about obstruction, absent any further evidence,

insufficient to estop defendants from raising non-exhaustion as an affirmative defense); Winston

v. Woodward, 05 Civ. 3385 (RJS), 2008 WL 2263191, at *9 (S.D.N.Y. May 30, 2008) (finding

defendants were not stopped from asserting failure to exhaust as a defense where plaintiff did not

provide any direct or substantial evidence to support his claim). These plaintiffs do not claim that

they were unaware of the existence of a grievance process and make no mention of particular

thwarted attempts to file a grievance. Glivens did state in the Complaint that he either did file or

tried to file a grievance regarding commissary prices. There is no indication that he actually filed

grievances or was prevented from doing so on the issues of meal preparation and tray sanitation.

Furthermore, these plaintiffs do not indicate who was involved in any potential obstructive

conduct or when such conduct occurred. See e.g., Butler v. Martin, 07 Civ. 521 (FJS)(GHL),

2010 WL 980421, at *5 (N.D.N.Y. Mar. 15, 2010) ("Even if, as alleged, Plaintiff's grievances

were discarded, Plaintiff offers no evidence that a particular officer discarded the grievances.").

Jenkins stated in the Complaint that he tried to file a grievance to supervisors but they refused to

accept them and gave him rehearsed responses. (Compl. at 16.) Absent specific details about

who refused his grievance, Jenkins's allegation is insufficient for exhaustion. Furthermore, there

is no evidence that these eight plaintiffs filed even one formal grievance according to WCDOC

guidelines; therefore, any concern about the threat of repercussions for multiple filings is

unsupported here.

Finally, plaintiffs do not claim that there are special circumstances justifying their

noncompliance with WCDOC grievance procedures. When considering if there are special

circumstances, a court should look "at the circumstances which might understandably lead

18

usually uncounselled prisoners to fail to grieve in the normally required way." Brownell v. Krom, 446 F.3d 305, 312 (2d Cir. 2006) (citation and quotation marks omitted). The Court of Appeals for the Second Circuit has found that "special circumstances may exist where the prison grievance regulations are confusing and the prisoner relies upon a reasonable interpretation of those regulations." Chavis, 333 F. App'x at 643. See e.g., Brownell, 446 F.3d at 312 (finding special circumstances where the plaintiff had been directed to file a grievance and abandon a reimbursement claim by corrections personnel only to have his grievance ignored as duplicative of his reimbursement claim).

Here, plaintiffs do not assert that they had difficulty understanding WCDOC's grievance procedure. Nor is there any indication that they did not comply with the proper procedure on the advice of WCDOC or Jail personnel. Given the lack of any evidence to indicate that WCDOC procedures are confusing or were misinterpreted by plaintiffs, the Court finds that there are no special circumstances excusing noncompliance.

The Court, therefore, concludes that these five inmates – Glivens, Llerandez, Barnett, Jenkins, and Dushock – did not follow WCDOC's grievance procedures and failed to plead sufficient facts of excuse. Given that these plaintiffs failed to allege (1) that administrative remedies were not available; (2) specific instances of impediment by Jail personnel; or (3) that a special circumstance applies, the Court recommends that defendants' motions to dismiss be granted as to all claims by Glivens, Llerandez, Barnett, Jenkins, and Dushock for failure to exhaust their administrative remedies.

### III.   Section 1983 Claims

Defendants argue that plaintiffs' § 1983 claims should be dismissed because they do not rise to the level of constitutional deprivations. To state a claim under § 1983, "a plaintiff must

show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution." Newton v. City of New York, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) (citing Palmieri v. Lynch, 392 F.3d 73, 78 (2d Cir. 2004)). Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." Newton, 566 F. Supp. 2d at 269-70 (citing Morris-Hayes v. Bd. of Educ. of Chester Union Free Sch. Dist., 423 F.3d 153, 159 (2d Cir. 2005)).

### A. Eighth Amendment Claim

Plaintiffs allege that defendants violated their Eighth Amendment right to be free from cruel and unusual punishment by serving under-cooked, rotted, or nutritionally inadequate food on contaminated meal trays. Plaintiffs also allege that defendants have engaged in price gouging through the Jail's commissary in violation of their Eighth Amendment rights.

Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment rather than by the Eighth Amendment's prohibition on cruel and unusual punishment, which applies only to convicted prisoners. Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996); Lloyd v. Lee, 570 F. Supp. 2d 556, 570 (S.D.N.Y. 2008). It is unclear if plaintiffs were pre-trial detainees or post-conviction prisoners during the period giving rise to this claim. For constitutional purposes, however, the analysis is the same. Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009) (claims for deliberate indifference should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment). Because "an unconvicted detainee's rights are at least as great as those of a convicted prisoner, courts apply the same 'deliberate indifference' test developed under the Eighth Amendment to Fourteenth Amendment claims." Lloyd, 570 F. Supp. 2d at 570 (internal citation and quotation marks omitted).

The Eighth Amendment, which applies to the states under the Due Process Clause of the Fourteenth Amendment, guarantees freedom from cruel and unusual punishment. U.S. Const., amend. VIII. To establish an Eighth Amendment violation with respect to living conditions, prisoners must demonstrate "unquestioned and serious deprivation of basic human needs" or of the "minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). The Supreme Court has identified food, clothing, shelter, medical care, reasonable safety, warmth, and exercise as basic human needs. See Helling v. McKinney, 509 U.S. 25, 32 (1993); Wilson v. Seiter, 501 U.S. 294, 304 (1991). To establish an Eighth Amendment violation, a plaintiff must demonstrate both that the challenged condition is serious – the objective component – and the official who is responsible for the conduct acted with deliberate indifference – the subjective component. See Farmer, 511 U.S. at 834; Wilson, 501 U.S. at 303.

### 1. Serious Deprivation – Objective Component

The Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983) (citation and quotation marks omitted). Here, plaintiffs' allegations can be grouped into four general violations: complaints about food preparation, sanitation of meal trays, portion size, and the price of commissary items.

Plaintiffs allege that the meals that they were served, including beef and chicken, were pink, raw, or red and sometimes looked and smelled like it was rotted. They allege that the salad was rotted and contained insects. Additionally, plaintiffs claim that the food trays were moldy and filled with bacteria from rotted water and that foul smelling water seeped out of the trays and into the inmates' food. The plaintiffs maintain that they frequently received contaminated meal

trays or improperly cooked or rotted food, sometimes three or four days a week. (See e.g., Sec.
Am. Compl. ¶¶ 73, 76, 85, 100, 103, 124, 140, 149.)

These specific facts, considered alongside the alleged resulting injuries of, *inter alia*,
severe stomach pain, nausea, vomiting, diarrhea, weight loss, and headaches are sufficient to
state a claim of a serious deprivation. See Lunney v. Brureton, 04 Civ. 2438 (LAK)(GWG), 2005
WL 121720, at *6 (S.D.N.Y. Jan. 21, 2005) (holding that allegations of regularly spoiled or
improperly prepared meals served on numerous occasions, leading to sickness when consumed
or malnutrition when refused, coupled with allegations that led to an inference of knowledge by
the prison officials, were sufficient to state an Eighth Amendment claim). See also Newman v.
Zenk, 05 Civ. 759 (ARR), 2007 WL 6888112, at *4 (E.D.N.Y. Mar. 29, 2007) (allegations of
improperly cooked food coupled with descriptions of illness were sufficient to survive a motion
for summary judgment, though the subjective prong was ultimately not satisfied); Griffin v.
Smith, 493 F. Supp. 129, 131 (W.D.N.Y. 1980) (unsanitary food utensils, cigarette burns and
hair on the meal trays were sufficient evidence on a motion to dismiss of a serious deprivation);
Murphy v. Wheaton, 381 F. Supp. 1252, 1261 (N.D. Ill. 1974) (the alleged serving of spoiled,
rotted, and foul food, *inter alia*, was sufficient to survive a motion to dismiss). Whether plaintiffs
can ultimately prevail on these claims is not the question before the Court.[5] "[A] complaint
adequately states a claim when it contains a short and plain statement of the claim showing that
the pleader is entitled to relief." Phelps v. Kapnolas, 308 F.3d 180, 186 (2d Cir. 2002) (citation
and quotation marks omitted). Plaintiffs have satisfied this requirement.

Plaintiffs have, however, failed to adequately plead a claim based on the provision of
food in nutritionally inadequate portions. Plaintiffs describe their meals as "small," "uneven," or

---

[5]  Defendants contend that these allegations were investigated and found to be not serious.

"minimum." (Sec. Am. Compl. ¶ 57, 81, 93, 141, 146.) Such allegations do not, however, suggest that plaintiffs face immediate danger to their health and well-being based on the portions of their servings standing alone. Robles, 725 F.2d at 15. See also Mays v. Springborn, 575 F.3d 643, 648 (7th Cir. 2009) ("prison officials cannot be held liable under the Eighth Amendment unless the prisoner shows both an objectively serious risk of harm"); McNatt v. United Manager Parker, 99 Civ. 1397 (AHN), 2000 WL 307000, at *5-6 (D. Conn. Jan. 18, 2000) (allegation of small food portions, absent evidence that prisoners suffered ill effects from these reduced portions, fails to state Eighth Amendment claim) (collecting cases). Plainly, plaintiffs' claims that most of the food was inedible relate to their claims of small food portions. But standing alone, plaintiffs have not adequately pled that they suffered an Eighth Amendment violation due to serving size alone.

Finally, plaintiffs allege that Aramark has violated plaintiffs' Eighth Amendment rights by price gouging. Plaintiffs attached to the Second Amended Complaint numerous pictures of commissary items with their corresponding prices. These claims regarding commissary prices, however, cannot survive defendants' motions to dismiss. Even if the prices in the Commissary are high, such "gouging" does not constitute a constitutional violation. See Mitchell v. City of New York, 10 Civ. 4121 (PKC), 2011 WL 1899718, at *2 (S.D.N.Y. May 13, 2011) ("there is no constitutional right to access a prison commissary"); Davis v. Shaw, 08 Civ. 364 (NRB), 2009 WL 1490609, at *1 (S.D.N.Y. May 20, 2009) (because a prisoner does not have a constitutional right to use of the prison commissary, any complaints regarding prices and selection do not make out a constitutional violation); Whitenack v. Armor Medical, 13 Civ. 2071 (SJF)(ARL), 2013 WL 2356110, at *4 (E.D.N.Y. May 28, 2013) (same).

Therefore, plaintiffs have pled a plausible claim of a serious deprivation of their constitutional rights as to their claims related to undercooked and rotten food and the use of unsanitary trays. I recommend, however, that the claims regarding portion size and high commissary prices be dismissed for failure to plead adequately a constitutional violation.

### 2. Deliberate Indifference – the Subjective Component

Pleading a constitutional deprivation is alone insufficient for an Eighth Amendment violation. Plaintiffs must also plead the subjective component: that a prison official knew of and disregarded an "excessive risk to inmate health or safety," which requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." Farmer, 511 U.S. at 837; see Caiozzo, 581 F.3d at 71 (plaintiff must show "that the government-employed defendant disregarded a risk of harm to the plaintiff of which the defendant was aware").

It is clear from the Second Amended Complaint that defendants were generally aware of the plaintiffs' concerns regarding undercooked meat, rotted food, and unsanitary meal trays given the number of letters written to Aramark and the Jail personnel, complaints logged, and investigations conducted. Furthermore, these letters, grievances, and complaints indicate the risk of harm posed to the inmates. In these documents, the inmates complain of severe stomach pains, nausea, and headaches. (See e.g., Sec. Am. Compl., Exs. 6, 5, 11, and 15.) One inmate requests medical attention. (Sec. Am. Compl., Ex. 13.) Moreover, there is no need for plaintiffs to introduce proof of a risk of harm when such risk is obvious. See Phelps, 308 F.3d at 186 ("a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious"). The serious health risks of consuming undercooked or contaminated food

24

are obvious. Therefore, there is a plausible claim that defendants knew of both the existence of the constitutional violations and the risk posed by such violations.

The second question is whether defendants disregarded the risk of harm. There is evidence to suggest that WCDOC and Aramark took steps to remedy any problems regarding food preparation or tray sanitation. WCDOC investigated grievances that were filed. Loughran personally inspected meal trays, removing those that needed to be replaced. He met with kitchen workers to review proper cooking procedures and measurements for the quantity of food served. Some inmates were provided with alternative meals when they complained, including the option of selecting a different meal tray, eating a sandwich, or microwaving their food.

Plaintiffs allege, however, that in spite of these inspections and trainings, Aramark continued to serve undercooked or rotted food on contaminated trays. Plaintiffs also allege that the defendants conspired together to serve inmates nutritionally inadequate meals and contaminated or undercooked meals to procure profits from the commissary, the only remaining source of nutrition for inmates. Both Aramark and Westchester County share in the profits from the commissary.

Evidence that some inmates were provided alternative options such as microwaving their food or eating a sandwich does not resolve the issue of these underlying allegations. Plaintiffs have pled a serious deprivation of a constitutional right and knowledge of the violation and the risk of harm by officials. This is sufficient to survive a motion to dismiss. See e.g., Phelps, 308 F.3d at 186 (finding that plaintiff had satisfied both the objective and subjective component of an Eighth Amendment violation by alleging that he was deprived of a nutritionally adequate diet for fourteen straight days and that prison officials knew that the diet was inadequate and likely to inflict pain).

25

**B.      First Amendment Claim**

Seven of the remaining plaintiffs – Pagan, Lewis, Dixon, Williams, Stevens, and Arici,–
allege violations of their First Amendment rights to the free exercise of religion. The basis of the
complaint is that defendants "indirectly interfered with certain [of] plaintiff[s] religious beliefs."
(Sec. Am. Compl. ¶ 1.)

The Supreme Court has held that "reasonable opportunities must be afforded to all
prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments
without fear of penalty." Cruz v. Beto, 405 U.S. 319, 322 n.2 (1972). To be protected by the Free
Exercise Clause of the First Amendment, the beliefs must be religious and must be sincerely
held. See Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003). "The governing standard [for
determining when state conduct violates an inmate's First Amendment free exercise rights] is
one of reasonableness, taking into account whether the particular regulation affecting some
constitutional right asserted by a prisoner is reasonably related to legitimate penological
interests." Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990). See also O'Lone v. Estate of
Shabazz, 482 U.S. 342, 349 (1987).

The Second Amended Complaint states that Pagan and Lewis noticed that the kosher
meals were served on clean trays, fully cooked, and in sufficient amounts. They decided to
switch their religious designations at the Jail from Catholic to Jewish in order to receive kosher
meals, which were nutritionally adequate. As a result of this change, they were no longer allowed
to attend Catholic mass.

Pagan and Lewis state a cognizable First Amendment claim. According to Pagan and
Lewis, they are Catholic and have been since birth. Pagan and Lewis admit that they requested
kosher meals not because of their sincerely held beliefs but because they wanted fully cooked

26

food in sufficient amounts. While the Jail may have been justified in limiting Pagan and Lewis's attendance to those services for the faith with which they identified, see e.g., Tapp v. Stanley, 04 Civ. 6400 (CJS), 2008 WL 4934592, at *5 n.5 (W.D.N.Y. Nov. 17, 2008) (recognizing the legitimacy of exclusion from a Christian Angel Tree program when the inmate changed his religion from Christianity to Judaism), the question still remains whether Pagan and Lewis were forced to make a change in their religious registration in order to be fed adequately.

The reasonableness standard not only applies to actual regulations but to policies, practices, and the conduct of prison personnel. See Ford, 352 F.3d at 595 n.15 ("Although Turner and O'Lone concerned the reasonableness of prison regulations, we have previously suggested that the analysis is the same as to an individual decision to deny a prisoner the ability to engage in some requested religious practice."). Here, there is a direct link between defendants' failure to provide nutritious food and the infringement upon these plaintiffs' religious exercise. Accordingly, Pagan and Lewis have adequately pled that their religious freedom was burdened because they were forced to choose between nutritional eating and attending their desired worship service.

Dixon, Williams, Stevens, and Arici are practicing Muslims. When they complained about undercooked meals served on moldy trays, they were offered an alternative meal of a bologna and cheese sandwich, sometimes three or four days a week. As Muslims, they are not permitted to eat bologna. There is no claim by defendants that these individuals' Muslim beliefs are not sincerely held. Dixon, Williams, Stevens, and Arici were originally provided with a meal that in principle conformed to their Muslim diet. In practice, however, the meals were undercooked and served on contaminated trays. The alternative they were offered was a bologna sandwich, which is haram to an individual of Muslim faith.

27

Such a claim is sufficient to survive a motion to dismiss. Taking all factual allegations in the Second Amended Complaint as true, the Jail's provision of inedible halal food and the provision of a religiously forbidden food item as an alternative may have burned these inmates' ability to practice their religion without a reasonable justification. Dixon, Williams, Stevens, and Arici were forced to choose between eating undercooked or rotten food that complied with their religious requirements or eating properly prepared, sanitary, and nutritional meals.

Accordingly, I conclude that Pagan, Lewis, Dixon, Williams, Stevens, and Arici and have all pled plausible claims of a First Amendment violation. See Ford, 352 F.3d at 597 (a prisoner "has a right to a diet consistent with his or her religious scruples"); see e.g., Houston v. Schriro, 11 Civ. 7374 (HB), 2013 WL 4457375, at * (S.D.N.Y. Aug. 20, 2013) (forcing plaintiff to choose between meals that met his religious criteria and low-sodium meals that met his medical needs imposed a substantial burden on the exercise of his religious beliefs).

Arici also complains that, approximately once a week, he was required to remind the correctional staff that he needed his "Muslim diet tray" rather than the standard one provided. And on days that he traveled to court, he often did not receive a meal in compliance with his Muslim faith. The Jail admitted that he had not received the appropriate meal on travel days and instructed the Jail personnel on the procedure to be followed. Arici accepted this resolution to his grievance. Lastly, he alleges that, after consuming one of his Muslim meals, he began to vomit and had a fever with diarrhea. He was informed by an inmate that another inmate worker had spit in his food because he was offended that he had to replace Arici's standard tray with a special Muslim tray. Arici was eventually diagnosed with Hepatitis B and is confident he contracted it from the spit of the inmate worker. These isolated instances, however, do not rise to the level of a constitutional violation.

28

**IV.     Personal Involvement of Individual Defendants**

Plaintiffs sue three individuals: (1) Kevin Cheverko, Commissioner of the Westchester County Department of Corrections; (2) Donna Blackman, Aramark's Commissary Supervisor at the Jail; and (3) Aramark's Joseph Loughran, Food Service Director at the Jail. An individual defendant's liability for damages under 42 U.S.C. § 1983 is predicated on his or her personal involvement in the constitutional deprivation. See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994). "To survive a motion to dismiss, a complaint must allege facts showing that a defendant was personally involved in the violation in at least one of five ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Wright, 21 F.3d at 501).

The Supreme Court further addressed supervisory liability for the unconstitutional conduct of subordinates in Ashcroft v. Iqbal, 556 U.S. 662 (2009). "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." Iqbal, 556 U.S. at 676. A government official "is only liable for his or her own misconduct." Id. at 677.

After Iqbal, courts in the Second Circuit are divided over how many of the Colon factors remain. See Rush v. Fischer, 923 F. Supp. 2d 545, 551-52 (S.D.N.Y. 2013) (citing cases). Post-Iqbal, however, the Court of Appeals has reiterated that "[a] supervisory official personally participates in challenged conduct not only by direct participation, but by (1) failing to take

29

corrective action; (2) creation of a policy or custom fostering the conduct; (3) grossly negligent supervision, or deliberate indifference to the rights of others." Rolon v. Ward, 345 F. App'x 608, 611 (2d Cir. 2009).

Plaintiffs do not allege that Commissioner Cheverko was personally involved in cooking the meals improperly or providing unsanitary trays to inmates. Plaintiffs do allege, however, that Cheverko was made aware, through regular staff meetings, grievances, verification of complaints in the complaint books, and letters from inmates, of the issues at the Jail regarding food preparation and the conditions of the trays. Plaintiffs further allege that Cheverko "turned a blind eye to the fact that Plaintiff's meals were being severed [sic] not fully cooked and safety rules during preparation were being disregarded." (Sec. Am. Compl. ¶ 30.)

Evidence of notification, via letters or complaints, of an unconstitutional condition is alone not sufficient to indicate that a defendant is personally involved in the unconstitutional conduct. See e.g., Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997) (finding prisoner failed to establish personal involvement by writing him letters even though the Commissioner responded and referred a letter to a subordinate for investigation); Vogelfang v. Capra, 889 F. Supp. 2d 489, 501-02 (S.D.N.Y. 2012) ("[M]ere receipt of a letter from an inmate, without more, does not constitute personal involvement for purposes of section 1983 liability."); Mateo v. Fischer, 682 F. Supp. 2d 423, 431 (S.D.N.Y. 2010) (holding receipt of two letters were insufficient to allege personal involvement).

Here, however, plaintiffs allege more than mere notification through written correspondence. They claim that Cheverko had daily meetings with the senior members of his staff, during which he was made aware of these ongoing issues. They specifically articulate that Cheverko ignored these violations. Plaintiffs' allegations against Cheverko could support a claim

for his liability under at least one of the theories set forth in Colon: that Cheverko was deliberately indifferent to the constitutional rights of others. See e.g., James v. Aidala, 389 F. Supp. 2d 451, 453 (W.D.N.Y. 2005) (on a motion to dismiss, finding sufficient allegations of personal involvement for Commissioner on claims that he was deliberately indifferent to unconstitutional conduct and failed to train and supervise department of correction employees). Therefore, I recommend that the motion to dismiss the claims against Cheverko in his individual capacity be denied.[6]

Plaintiffs also sufficiently pled the personal involvement of Food Service Director Joseph Loughran. Plaintiffs claim that Loughran did not enforce safe temperatures for food service, did not properly train new workers in food handling, and allowed for uncooked meals to be served. In addition, documents attached to the Second Amended Complaint indicate that Loughran personally inspected each of the meal trays, making determinations as to which ones should be removed and which ones should remain in circulation. (Sec. Am. Compl., Exh. 4.) These same documents also indicate that Loughran was directly involved in the training and supervision of those involved with meal preparation. (Sec. Am. Compl., Exh. 4.) Thus, plaintiffs have pled sufficiently the personal involvement of Loughran in plaintiffs' constitutional violations through his direct participation, gross negligence in supervising subordinates who committed the wrongful acts, or deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. See Rolon, 345 F. App'x at 611.

---

[6] Plaintiffs also brought their claims against Cheverko in his official capacity as the Commissioner of Westchester County. In § 1983 suits, acts of municipal department officials in their official capacity are equated with the acts of a municipality itself. See Brandon v. Holt, 469 U.S. 464, 472 (1985). Therefore, any claims against Cheverko in his official capacity will be treated as claims against Westchester County.

Finally, plaintiffs allege that Donna Blackman, the Aramark Commissary Supervisor, raised the prices of commissary items, sold spoiled goods and goods that should have been given to inmates at no charge, and assisted Aramark in assessing a shipping and handling cost for iCare packages that were not actually shipped. Because, as discussed earlier, plaintiffs' Eighth Amendment claims regarding commissary prices should be dismissed for failure to state a constitutional violation, the claims against Blackman should be dismissed as well. While plaintiffs have adequately pled Blackman's involvement in the activities of the commissary, they have failed to plead that she was personally involved in any constitutional violation.

Plaintiffs do not allege that Blackman was personally involved in the daily meal preparation at the Jail or had any supervisory authority over the individuals who prepared the meals or processed the meal trays. The Second Amended Complaint states that Blackman was "aware of Joseph Loughran's actions . . . and still contributed her part to maintain the strength and operation and maintain her status." (Sec. Am. Compl. ¶ 42.) Such conclusory allegations are insufficient to establish personal liability over any constitutional violations stemming from the food service. Moreover, Blackman cannot be held responsible for violations by individuals over whom she had no supervisory authority. See e.g., Morris v. Eversley, 282 F. Supp. 2d 196, 206-07 (S.D.N.Y. 2003) (finding no personal involvement where there was no supervisory authority). Nor is there any indication that she was responsible for the creation of a policy or practice that led to improperly cooked food or unsanitary meal trays. Blackman's role in the "monopoly" at the Jail (Sec. Am. Compl. ¶ 37), appears to be limited to her work in the commissary. Therefore, I recommend that all claims against Blackman be dismissed for failure to plead her personal involvement in a constitutional violation.

32

Accordingly, I recommend that the motions to dismiss all claims against Cheverko and

Loughran in their individual capacities be denied. I further recommend that Aramark's motion to

dismiss the claims against Blackman be granted.

## V.    Claims against Aramark and Westchester County

To state a claim under § 1983, plaintiffs must show that they were denied a constitutional

or federal statutory right and that the deprivation of that right occurred under color of state law.

See 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48 (1988).

### A.  Aramark as a State Actor

"Because the United States Constitution regulates only the Government, not private

parties, a litigant claiming that his constitutional rights have been violated must first establish

that the challenged conduct constitutes state action." Flagg v. Yonkers Sav. & Loan Ass'n, 396

F.3d 178, 186 (2d Cir. 2005) (internal quotation marks omitted). "A plaintiff pressing a claim of

violation of his constitutional rights under § 1983 is thus required to show state action." Tancredi

v. Metro. Life Ins. Co., 316 F.3d 308, 312 (2d Cir. 2003).

"[S]tate action requires both an alleged constitutional deprivation 'caused by the exercise

of some right or privilege created by the State or by a rule of conduct imposed by the State or by

a person for whom the State is responsible,' and that 'the party charged with the deprivation

must be a person who may fairly be said to be a state actor.'" Am. Mfrs. Mut. Ins. Co. v.

Sullivan, 526 U.S. 40, 50 (1999) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937

(1982) (emphasis omitted). "Conduct that is formally 'private' may become so entwined with

governmental policies or so impregnated with a governmental character that it can be regarded as

governmental action." Rendell–Baker v. Kohn, 457 U.S. 830, 847 (1982) (internal quotation

marks omitted). But a private entity does not become a state actor for purposes of § 1983 merely

on the basis of "the private entity's creation, funding, licensing, or regulation by the government." Cranley v. Nat'l Life Ins. Co. of Vt., 318 F.3d 105, 112 (2d Cir. 2003). Rather, "there must be such a close nexus between the [s]tate and the challenged action" that the state is "responsible for the specific conduct of which the plaintiff complains." Id. at 111 (internal quotation marks omitted).

While the Supreme Court has not established a single test to identify state actions and state actors, a "host of factors can bear on the fairness of an attribution of a challenged action to the State." Cooper v. U.S. Postal Serv., 577 F.3d 479, 491 (2d Cir. 2009). In this circuit, three main tests have emerged:

> For the purposes of section 1983, the actions of a nominally private entity are attributable to the state . . . (1) [when] the entity acts pursuant to the coercive power of the state or is controlled by the state ("the compulsion test"); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ("the joint action test" or "close nexus test"); or (3) when the entity has been delegated a public function by the state ("the public function test").

Fabrikant v. French, 691 F.3d 193 (2d Cir. 2012) (quoting Sybalski v. Indep. Grp. Home Living Program, Inc., 546 F.3d 255, 257 (2d Cir. 2008)). See also Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 296 (2001).

Aramark contends that all of the claims against it should be dismissed because it is an "independent contractor" and not a state actor liable under 42 U.S.C. § 1983. The role of providing food to inmates is the responsibility of the state. Farmer v. Brennan, 511 U.S. 825, 832 (1994) ("prison officials must ensure that inmates receive adequate food . . ."). Here, Westchester County has a duty to provide nutritionally adequate food to those incarcerated within its facility. The County has contracted with Aramark to perform this governmental

function. Thus, Aramark is serving a public function in providing daily meals to inmates. See e.g., McCullum v. City of Philadelphia, Civ. A. 98-5858 (LB), 1999 WL 493696, at *3 (E.D. Pa. July 13, 1999) ("Providing food service, like medical care, to those incarcerated people is one part of the government function of incarceration."); Drennon v. ABL, 06 MC 0126 (TJC), 2006 WL 3448686, at *2 (M.D. Tenn. Nov. 27, 2006) (finding a food service provider at a correctional facility to be acting under color of state law).

Furthermore, there is a sufficiently close nexus between the County of Westchester and Aramark's actions such that the conduct of Aramark is attributable to the state itself. Under the close nexus standard, a court will analyze "whether the state can be fairly held responsible for private conduct by virtue of the ties between the state and private actor." Preston v. New York, 223 F. Supp. 2d 452, 466 (S.D.N.Y. 2002) (citing Blum v. Yaretsky, 457 U.S. 991, 1004-1006 (1982)). In other words, there must be such a "close nexus between the State and the challenged action, that seemingly private behavior may be fairly treated as that of the State itself." Vega v. Fox, 457 F. Supp. 2d 172, 181 (S.D.N.Y. 2006) (citation and quotation marks omitted).

Here, Aramark provides food for the inmates at the Jail pursuant to a contract with the County. The Jail provides oversight for Aramark's services. Aramark's "seemingly private behavior" can be treated as that of the state given that the challenged action, proper food service, flows directly from the obligations of the government entity and is performed under its supervision. See e.g., Gerber v. Sweeney, Civ. A. 02-241 (ECR), 2003 WL 1090187, at *1 (E.D. Pa. Mar. 7, 2003) (finding a "close nexus" between the state and the employee of a food service provider for the prison to satisfy the "under color of state law" requirement for a § 1983 claim).

The role of Aramark as food provider is similar to that of private physicians paid to care for inmates at state and local facilities. In these cases, courts have consistently held that the

physician is acting under color of state law when providing treatment to inmates. See e.g., West, 487 U.S. at 54 (holding that a private physician employed by the state "to provide medical services to state prison inmates acted under color of state law for purposes of § 1983 when undertaking his duties in treating petitioner's injury"); Garraway v. Artuz, 01 Civ. 3126 (DLC), 2002 WL 221584, at *6 (S.D.N.Y. Feb. 13, 2002) (finding provision of medical services to a ward of the State by contractual arrangement to constitute state action).

Furthermore, other courts have held that Aramark is acting under color of state law for § 1983 liability when it provides food to state inmates. See e.g., Jubeh v. Dart, 11 Civ. 3873 (RWG), 2011 WL 6010267, at *2 (N.D. Ill. Nov. 29, 2011) (finding Aramark to have been acting under the color of state law and collecting cases); McRoy v. Sheahan, 03 Civ. 4718 (GSB), 2004 WL 1375527, at *2 (N.D. Ill. June 17, 2004) ("As a contractor performing the public function of running a jail, Aramark is acting under the color of state law and is treated the same as a municipality for purposes of § 1983."); McCullum, 1999 WL 493696, at *3 (finding that Aramark, under the public function test, acted under color of state law for purposes of § 1983 by performing the traditional government function of providing food service at a prison); Smego v. Aramark Food Servs. Corp., 10-3334 (SEM), 2013 WL 1987262, at *6 (C.D. Ill. May 13, 2013) (same). But see James v. Correct Care Solutions, 13 Civ. 0019 (NSR), 2013 WL 5730176, at *9 (S.D.N.Y. Oct. 21, 2013) (finding nothing in the complaint to suggest that Aramark should be treated as a state actor in case alleging injury caused by loose floor plate in jail kitchen).

Aramark argues repeatedly that as an independent contractor it is not acting under color of state law. While state employment, as a general rule, is sufficient to render the defendant a state actor, an employer-employee relationship is not necessary to a determination of state action

or action taken under color of state law. West, 487 U.S. at 55-56. It is the function of the private

actor within the state system, not "the precise terms of his employment, that determines whether

his actions can fairly be attributed to the State . . . ." Id. As such, the Court concludes that

Aramark is acting under color of state law for purposes of § 1983 liability by providing daily

meals to the inmates at the Jail, a duty Westchester County ordinarily owes to the inmates.[7]

### B.  Monell Liability

In Monell v. Department of Social Services of New York, the Supreme Court held that

municipalities may be sued under § 1983 "where . . . the action that is alleged to be

unconstitutional implements or executes a policy statement, ordinance, regulation, or decision

officially adopted and promulgated by [the municipality's] officers." Monell, 436 U.S. 658, 690

(1978). As discussed above, the Monell doctrine has been extended to private entities acting

under color of state law. Nonetheless, as is true for municipal defendants, "[p]rivate employers

are not [vicariously] liable under § 1983 for the constitutional torts of their employees." Rojas v.

Alexander's Dept. Store, Inc., 924 F.2d 406, 408-09 (2d Cir. 1990) (citing cases). Ricciuti v.

New York City Transit Auth., 941 F.2d 119, 122 (2d Cir. 1991); Whalen v. Allers, 302 F. Supp.

2d 194, 202-03 (S.D.N.Y. 2003) (private employer cannot be held vicariously liable under §

1983 because "'there is no tenable reason[ ] to distinguish a private employer from a

municipality'") (quoting Temple v. Albert, 719 F. Supp. 265, 268 (S.D.N.Y. 1989)). Thus, to

state a § 1983 claim against a municipality and private entity, a plaintiff must allege that an

action pursuant to some official policy caused the constitutional deprivation. Rojas, 924 F.2d at

---

[7] Because plaintiffs' claims regarding commissary prices should be dismissed given that there is no
constitutional right to the use of a commissary while incarcerated, see Section V(A)(1) below, the Court
need not determine, and I do not discuss, whether Aramark is a state actor with regard to its role as
provider and facilitator of the commissary at the Jail.

408-09 (citations omitted). To establish the existence of a policy, the plaintiff must allege one of

the following:

> (1) a formal policy which is officially endorsed by the municipality; (2) actions
> taken or decisions made by government officials responsible for establishing
> municipal policies which caused the alleged violation of the plaintiff's civil
> rights; (3) a practice so persistent and widespread that it constitutes a "custom or
> usage" and implies the constructive knowledge of policy-making officials; or (4)
> a failure by official policy-makers to properly train or supervise subordinates to
> such an extent that it "amounts to deliberate indifference to the rights of those
> with whom municipal employees will come into contact."

Jones v. Westchester Cnty. Dep't of Corr. Med. Dep't, 557 F. Supp. 2d 408, 417 (S.D.N.Y.

2008) (citations omitted).

Here, plaintiffs have pled a plausible claim for the violation of their First and Eighth

Amendment rights. The question is whether they have also pled sufficiently that such violations

were the result of a policy or custom. There is evidence in some of the documents attached to the

Second Amended Complaint that Aramark and WCDOC investigated the complaints, reinforced

proper food preparation procedures with workers, examined and removed problematic trays, and

provided alternatives to inmates whose meals were not cooked. Such conduct does not, however,

directly address whether Aramark consistently served nutritionally inadequate, undercooked food

on unsanitary trays according to a policy or custom. The Court need to not consider at this stage

whether after-the-fact remedies affect the existence of an independent policy or custom that

violated the plaintiffs' rights. And, in any event, plaintiffs allege that the constitutional violations

continued in spite of any remedial measures.

Plaintiffs also allege that Aramark, Westchester County, Loughran, Blackman, and

Cheverko all failed to properly train inmates on food preparation and handling. The inadequacy

of training may serve as the basis for municipal liability only where the failure to train amounts

to deliberate indifference to the rights of the person with whom the defendants come into contact.

City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989). In order to support a claim that a
failure to train amounts to "deliberate indifference," a plaintiff must demonstrate:

> (1) that "a policymaker [of the municipality] knows 'to a moral certainty' that
> [its] employees will confront a given situation"; (2) that "the situation either
> presents the employee with a difficult choice of the sort that training or
> supervision will make less difficult or that there is a history of employees
> mishandling the situation"; and (3) that "the wrong choice by the . . . employee
> will frequently cause the deprivation of a citizen's constitutional rights."

Yuan v. Rivera, 48 F. Supp. 2d 335, 356 (S.D.N.Y. 1999) (quoting Walker v. City of New York,
974 F.2d 293, 297-98 (2d Cir. 1992). "A pattern of similar constitutional violations by untrained
employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure
to train." Connick v. Thompson, 131 S. Ct. 1350, 1360 (citation and quotation marks omitted).
Here, plaintiffs have alleged that inadequately trained workers preparing the food at the Jail
frequently served undercooked food, rotten food, or inadequate portions.

The Court cannot say at this point in the litigation that plaintiffs present no plausible
claim of (1) a practice so persistent and widespread that it constitutes a "custom or usage" and
implies the constructive knowledge of policy-making officials or (2) a failure by official policy-
makers to properly train or supervise subordinates to such an extent that it amounts to deliberate
indifference to the rights of those with whom municipal employees will come into contact. See
Jones, 557 F. Supp. 2d at 517. Therefore, I recommend that the motions to dismiss the Eighth
and First Amendment claims for failure to establish a policy, pattern, or practice under Monell be
denied.

**VI.      RICO Claim**

Plaintiffs assert a violation of RICO, 18 U.S.C. § 1961–1968. Plaintiffs failed to clearly articulate the basis for the alleged RICO violation, but the claim appears to involve the commissary, fraudulent shipping and handling fees, a monopoly, and price gouging. (Sec. Am. Compl. at 2, 30.) Plaintiffs believe that Aramark benefits by providing insufficient and improperly cooked food to inmates, thereby forcing inmates to buy overpriced items at the Aramark-operated commissary. (Sec. Am. Compl. ¶ 27.) Furthermore, plaintiffs allege that the iCare system charges shipping and handling to family members when no shipping and handling occurs; the care packages are prepared by personnel at the Jail. (Sec. Am. Compl. ¶ 1.)

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect interstate . . . commerce, to conduct or participate, directly, or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c); Hemi Group, LLC v. City of New York, 559 U.S. 1, 6 (2010). The RICO statute provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). To establish a violation of section 1962(c), a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." De Falco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001) (citations omitted). What constitutes "racketeering activity" is limited to specific activities identified in the RICO statute. See 18 U.S.C. § 1961(1). See also, Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 497 (1985); GICC Capital Corp. v. Tech. Fin. Group, Inc., 67 F.3d 463, 465 (2d Cir. 1995). A plaintiff may sue under § 1964(c) only if the alleged RICO violation was the proximate cause of the plaintiff's injury. Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 268 (1992).

Here, plaintiffs have failed to plead sufficiently either the existence of an enterprise or a series of criminal activities that would constitute racketeering activity under 18 U.S.C. § 1961. First, plaintiffs have failed to plead that there is an independent enterprise. "The Supreme Court has held that a RICO person-that is the individual who directs the RICO enterprise-must be distinct from the RICO enterprise itself, . . . and that a RICO enterprise must be 'separate and apart from the pattern of [racketeering] activity in which it engages.'" Sheridan v. Mariuz, 07 Civ. 3313 (SCR)(LMS), 2009 WL 920431, at *6 (S.D.N.Y. Apr. 6, 2009) (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)).

Plaintiffs allege that Aramark "created a website that allows families and friends to pay for commissary items which defendants deliver to plaintiffs and [the] inmate population." (Sec. Am. Compl. ¶ 1.) The Second Amended Complaint further alleges that defendants fraudulently charged a shipping and handling fee of five dollars for shipment from headquarters in Pennsylvania when no shipping occurred. Id. Aramark operates the commissary and the iCare website and profits from these fraudulent charges. There is no other independent enterprise indentified, and therefore, the Second Amended Complaint fails to state a claim upon which relief can be granted. See Park South Assocs. v. Fischbein, 626 F. Supp. 1108, 1112 (S.D.N.Y. 1986) ("It is well settled within this circuit that a defendant may not fulfill both the role of 'person' and 'enterprise' for purposes of § 1962(c) . . . ."); Berry v. New York State Dept. of Corr. Servs., 808 F. Supp. 1106, 1111 (S.D.N.Y. 1992) (finding a complaint insufficiently pled where "the association-in-fact that is alleged to be the racketeering enterprise is identified as the defendants as well") (citing U.S. v. Gelb, 881 F.2d 1155, 1164 (2d Cir. 1989)).

Second, plaintiffs have failed to plead sufficiently any racketeering activity. Mail and wire fraud, a monopoly, and price gouging are the only activities in the Second Amended

Complaint that could be construed to be a claim of criminal activity. (Sec. Am. Compl. ¶¶ 1, 10, 55.) Plaintiffs, however, have failed to plead facts that would allow the Court to conclude that defendants have committed mail or wire fraud under federal statutes. To sustain a RICO action based on mail or wire fraud, plaintiffs "must plead the elements of an indictable offense under the federal mail or wire fraud statutes by showing that each defendant (1) participated in a scheme to defraud, and (2) knowingly used the mails or wires to further the scheme." <u>Beck v. Manufacturers Hanover Tr. Co.</u>, 645 F. Supp. 675, 680 (S.D.N.Y. 1986); 18 U.S.C. §§ 1341, 1343.

There is no evidence in the Second Amended Complaint to demonstrate that the defendants intentionally sought to defraud plaintiffs or that they used "the mails or wires" to do so. Plaintiffs' conclusory allegations are countered by evidence in the Second Amended Complaint of legitimate reasons for the five dollar charge. Aramark informed Gomez in a letter dated October 8, 2012, that the Shipping and Handling Fee covers the "costs associated with assembly of the gift bag, the necessary technology needed for friends and family to order the gift bag, the credit card process call center support and web hosting." (Sec. Am. Compl., Exh. 25.) Though labeled shipping and handling, the charge is not being assessed to cover actual shipping costs. Plaintiffs have failed to demonstrate that defendants intended to defraud inmates and their families by falsely charging a shipping fee.

If plaintiffs are alleging that price gouging and maintaining a monopoly are the racketeering activity, their claims cannot survive a motion to dismiss. Neither price gouging nor operating a monopoly is listed as "racketeering activity" in 18 U.S.C. § 1961. Therefore, such allegations do not constitute a RICO violation. <u>See e.g.</u>, <u>Park South Assocs.</u>, 626 F. Supp. at 1114 (allegations of assault could not constitute a "predicate 'racketeering act'" because it was

not enumerated in 18 U.S.C. § 1961(1)). Plaintiffs have not plead sufficiently the existence of an enterprise or a pattern of racketeering activity, and the RICO claims should be dismissed for failure to state a claim upon which relief can be granted. See Chapdelaine v. Keller, 95 Civ. 1126 (RSP)(GLS), 1998 WL 357350, at *14 (N.D.N.Y. 1998) (dismissing inmates RICO claim for failing to identify specific allegations of racketeering activity related to the prison commissary).

## VI.   Violation of Settlement Agreement in <u>Perez v. Westchester County Department of Corrections</u>

The Muslim plaintiffs, Dixon, Williams, Stevens, Arici, and Charles allege that they are not receiving their halal meals as frequently as the Jewish inmates receive their kosher meals in violation of the settlement agreement in Perez v. Westchester County Department of Corrections. In Perez, thirteen inmates sued Westchester County for violations of their First, Eighth, and Fourteenth Amendment rights. See Perez, 587 F.3d 143, 145 (2d Cir. 2009) (discussing attorney's fees application). In March 2008, the parties in Perez entered into a settlement agreement with the defendants that was so-ordered by the Hon. Richard M. Berman of the Southern District of New York. In the agreement, the defendants agreed to provide all present and future Muslim inmates of the Jail with a "halal" meal, if requested, with the same frequency that the County provided kosher meals to Jewish inmates. See Perez, 587 F.3d at 148.

The agreement in Perez was a private settlement agreement not a consent decree. Perez Settlement Agreement ("The parties have agreed that this settlement agreement is not a consent decree."). While a consent decree may be enforceable by future inmates, a settlement agreement usually may not. "The parties to a consent decree as well as its *intended* beneficiaries have standing to seek enforcement of the resulting judgment . . . ." Rutter Group, Practice Guide: Federal Civil Procedure Before Trial, National Edition § 15:139.32 (emphasis in original). See e.g., Hook v. Arizona, Dep't of Corr., 972 F.2d 1012, 1014-15 (9th Cir. 1992) (new inmates

43

could enforce consent decree obtained by previous inmates).

Under New York law, third parties to private agreements may enforce a contract "if the contracting parties intended the contract for the third party's direct benefit." Drake v. Drake, 455 N.Y.S.2d 420, 422 (4th Dep't 1982). "It is not enough that the contract benefit the third party incidentally; the agreement must express an intent to assume a duty directly to the third party." Id.

The Perez Settlement Agreement specifically references future inmates of the Jail. "County Defendants shall continue to serve all present and future Muslim inmates of the [] Jail . . . with Halal meat patties or other Halal meat products with the same frequency as Kosher meat is served . . . ." (Perez Agreement at 7.) "Future inmates" are mentioned multiple times in the Agreement. (See e.g., Perez Agreement at 7, 8.) The current plaintiffs may be considered third party beneficiaries of the Perez Agreement. See e.g., Sisney v. Reisch, 754 N.W.2d 813, 818 (S.D. 2008) (finding that under the law of South Dakota a settlement agreement requiring the provision of a kosher meal "to all Jewish inmates who request[ed] it" was sufficient to satisfy the third-party beneficiary requirements for a non-party inmate).

Even if under New York law there is a plausible claim that the current inmates are third party beneficiaries to whom Westchester County owes a duty based on the Perez Agreement, the Court could afford them no relief. The only relief available would be the enforcement of the Settlement Agreement, specifically those portions of the Agreement requiring WCJ to provide halal meals as frequently as kosher meals. As none of the plaintiffs appear to be incarcerated at WCJ, any claims for injunctive relief are moot. See Thompson, 284 F.3d at 415-16.

Accordingly, I recommend that the defendants' motions to dismiss the claims by Dixon, Williams, Stevens, Arici, and Charles for a violation of the <u>Perez</u> settlement agreement be granted.

## CONCLUSION

For the reasons discussed above, I recommend GRANTING defendants' motions to dismiss for failure to exhaust their administrative remedies before filing this action as to only Glivens, Llerandez, Barnett, Jenkins, and Dushock. These plaintiffs should be dismissed from this action.

With respect to those claims brought by the remaining plaintiffs, I recommend GRANTING Aramark's motion to dismiss all claims against Donna Blackman. I further recommend GRANTING all defendants' motions to dismiss plaintiffs' Eighth Amendment claims related to food portions and high commissary prices, plaintiffs' RICO claims, and plaintiffs' state law claim for breach of the <u>Perez</u> Settlement Agreement. In all other respects, defendants' motions should be DENIED.

*          *          *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS
TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. <u>See also</u> Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the

45

chambers of the Honorable Paul A. Engelmayer at the United States Courthouse, 40 Foley

Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must

be addressed to Judge Engelmayer. The failure to file these timely objections will result in a

waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge


DATED:      New York, New York
            February 3, 2014


cc:         To All Plaintiffs (*By Chambers*)


46